UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

GREENFIELD MILLS, INC., et al.          )
                                        )
        Plaintiffs,                     )
                                        )
v.                                      )   Cause No. 1:00 CV 0219
                                        )
ROBERT E. CARTER, JR., as Director      )
of the Indiana Department of Natural    )
Resources, et al.                       )
                                        )
        Defendants.                     )

OPINION AND ORDER

Plaintiffs are riparian landowners along a five-mile portion of the Fawn River that begins at

Orland Dam and ends at Greenfield Millpond.[1]   The present dispute arose on May 18, 1998, after

the Defendants drained a supply pond into the Fawn River and, in the process, flushed sediment

from the supply pond into the river.  According to the Plaintiffs, the result of this process was to

deposit massive amounts of sediment into the Fawn River thereby destroying the aquatic life and

altering the aesthetics and water quality of the river.

The Plaintiffs, believing the release of the sediment into the Fawn River to be a malicious

and/or retaliatory act by the State, brought suit under 42 U.S.C. §§1983 and 1985 asserting claims

---

[1]The Fawn River runs through the Fawn River State Fish Hatchery ("Hatchery") from east to west and passes behind the main administration building.  The river has been dammed (Orland Dam) near the Hatchery to form a 1.75 acre supply pond which feeds (by gravity) the six rearing ponds on the west side of State Route 327.  The water level of the supply pond is regulated by two different structures, the main flow control structure located at the southern end of the dam, and an emergency spillway located at the northern end of the dam.  A bypass channel upstream of the supply pond is used to divert water before it reaches the supply pond.  When the Orland Dam is opened, the water flows from the supply pond down the Fawn River and, five miles later, reaches the Greenfield Millpond. (Docket #204, p. 6).

1

under the First, Fourth, Fifth and Fourteenth Amendments.[2] In addition, Plaintiffs sued under the

Citizen Suit provision of the Clean Water Act ("CWA"), 33 U.S.C. §1251 alleging that the

Defendants illegally deposited dredge and fill  materials in violation of 33 U.S.C. §1344 (hereafter

"§404")[3] into the Fawn River without a proper permit.

This court originally granted the Defendants' motion for summary judgment on all claims

and Plaintiffs appealed.  On appeal, the Seventh Circuit wisely[4] solicited amicus briefs from the

Environmental Protection Agency relating to the statutory regulations at issue and their application

to the facts of this case. On March 19, 2004, the Seventh Circuit Court of Appeals entered a written

opinion affirming the judgment of this court on the civil rights claims but reversing and remanding

as to the Clean Water Act claim.  *Greenfield Mills v. Macklin*, 361 F.3d 934 (7th Cir. 2004).

In its Opinion, the Seventh Circuit concluded as a matter of law, that the Defendants were

subject to the permitting requirements of 33 U.S.C. §1344(a) ("§404").  *Greenfield Mills*, 361 F.3d

at 949 ("The defendants' actions of May 19, 1998, therefore, constituted an addition of dredged spoil

into the Fawn River and were subject to the permit requirement of §404."). The panel further noted,

however,  that the regulations also provide an exclusion from the permitting requirements for the

maintenance of dams. 33 U.S.C. §1344(f)(1)(b). Thus, the Seventh Circuit concluded that the

---

[2]Early in the lawsuit, Plaintiffs voluntarily dismissed their claims of conspiracy under 42 U.S.C. §1985.  On November 20, 2001, Plaintiffs filed a Motion for Partial Dismissal dismissing their §1983 claims implicating the First and Fourth Amendments as well as their claim  for violation of the Equal Protection clause.

[3]Plaintiffs also originally claimed a violation of 33 U.S.C. §1342 ("§402") which requires a permit for the discharge of pollutants.  The Seventh Circuit foreclosed consideration of this claim on appeal  indicating that the proper permitting scheme to be applied in this case was §404 related to dredging and filling.

[4]The word "wisely" is utilized because the issues presented in the case were issues of first impression and, in hindsight, it would have been prudent for the undersigned to have had the benefit of the EPA's wisdom prior to deciding the issues in the case.

Defendants were subject to the permitting requirement of §404, unless they proved that they were subject to an exemption under 33 U.S.C. §1344(f)(1)(b) and that the defendant's actions were not "recaptured" under 33 U.S.C. §1344(f)(2).[5]  The Court then outlined the factual questions to be resolved on remand: (1) Did the Defendants' activities qualify under the maintenance exemption? In determining the answer to this question, the Seventh Circuit specifically concluded that there were genuine issues of material fact as to whether maintenance was the actual purpose of the defendants' activities rather than a  pretext to dredge the pond without a permit. (*Id.* at 951).  The Seventh Circuit also noted that if the jury concluded that  maintenance was the actual purpose it would then be required to determine whether the draw-down and discharge of sediment was reasonably necessary to perform the maintenance.  *Id.* at 952 ("...the maintenance exemption should be construed so that only dredging that is reasonably necessary to the proposed maintenance is exempt from the permit requirement....we believe that the plaintiffs have brought forth sufficient evidence to permit the trier of fact to conclude that the dredging of the pond was not reasonably necessary to either the maintenance of the pump or the alleged inspection of the gates.").

Upon remand to this court, the parties sought, and the court granted, extended discovery and the opportunity to file renewed summary judgment motions, particularly as to whether the activities of May 18, 1998 fell within the exemption.  Renewed motions were filed and numerous telephone conferences were conducted by the undersigned relating to the motions.  On June 28, 2005, the undersigned granted summary judgment in favor of the plaintiffs after the defendants **<u>conceded</u>** that their actions of May 18, 1998 were not reasonably necessary to make the repairs to the dam, which,

---

[5]The recapture provision provides that "any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired ...shall be required to have a permit..."  33 U.S.C. §1344(f)(2).

in turn, disqualified the defendants' actions from meeting the maintenance exemption. *See Docket # 208.* Accordingly, the undersigned concluded that the defendants were liable to the plaintiffs for any damage to the Fawn River occasioned by the May 18, 1998 event.

Thereafter, the parties embarked on efforts to determine the extent of the damage to the Fawn River, if any, and, assuming some damage was found, the best course for remediating it. To that end, the parties **agreed** to the appointment of a neutral expert, CH2M Hill and **agreed** that the defendants would pay the cost of the expert's assessment pursuant to a rate sheet attached to the stipulation. (Docket #222). CH2M Hill then began its assessment of the Fawn River.

Not long after the assessment began, Defendants filed a motion opposing the work of CH2M Hill. The thrust of that motion was that the defendants objected to the projected cost of CH2M Hill's
work as well as the methodologies to be employed by the firm. As a result of this motion, on April 18, 2006, the parties filed a stipulated "Modified Order Appointing CH2M Hill to Serve As a Neutral Expert and Procedures" ("Modified Order," Docket #250). The Modified Order contemplates a three phase plan for remediation with court intervention after each phase is completed. Phase I, the subject of the current motions, required CH2M Hill to determine whether the Fawn River and/or Greenfield Mills Pond are presently damaged from excess sediments, or the effects of excess sediments.

In July 2006, CH2M Hill submitted a proposed Phase I Scope outlining the precise work to be performed. A joint stipulation approving CH2M Hill's Phase I Scope was filed on August 2,

2006 and approved by the undersigned on August 3, 2006.[6]  In September 2006, CH2M Hill

submitted a work plan to the parties outlining the field investigation methodologies it would employ.

After receiving commentary from the parties, presumably objecting to portions of it, CH2M Hill

submitted a revised work plan.   Subsequently, CH2M Hill discovered that the initial field

investigation revealed the need for additional testing and on October 23, 2006, CH2M Hill submitted

a proposal to the parties to conduct additional sediment coring using vibracoring.   Defendants

objected to this proposal and, in response, on November 13, 2007, a revised proposal was submitted

and apparently approved by the parties.

On April 26, 2007, the court received CH2M Hill's Report on Phase I ("the Report").

Presently, before the court is the Plaintiffs' "Motion for Initiation of Phase II Planning" filed on May

2, 2007, wherein Plaintiffs assert that the findings of the Report , as outlined in the Modified Order,

support continuation of  CH2M Hill's to the second phase.  Defendants responded in opposition to

the Motion and a hearing was held on November 2, 2007.  In addition to the attendance of the parties

and their counsel at the hearing, two representatives from CH2M Hill were present and testified

regarding CH2M Hill's Phase I  findings.

The objectives of Phase I were set forth in detailed fashion in the Modified Order as follows:

A.      Determine whether excess sediment, or the consequences of it, are adversely
        affecting their biological or ecological health and function relative to
        Reference Conditions.

B.      Determine whether excess sediment or its consequences is adversely
        affecting their physical, aesthetic, or recrea6tional health values relative to
        those uses and values that existed immediately prior to May 18, 1998.

---

[6]The events that follow from September until CH2M Hill's report was received occurred without
the knowledge of the court.  No filings were made indicating changes to the procedure of CH2M Hill or
that objections to those changes had been made  and thus, there was no court intervention during this
time.

C.    Determine how current sediment conditions of the river and Greenfield Mills Pond compare to historical data, evidence, and descriptions of conditions prior to May 18,1998.

The Report is a comprehensive report detailing the sediments, natural vegetation, biological and ecological health of the Fawn River.  With respect to the first objective, CH2M Hill summarized its conclusions as follows:

> In summary, the sediment conditions observed along the Fawn River from the Orland Dam downstream to the Greenfield Mills reservoir show signs of impact from sediments attributable to the May 18, 1998, release.  This is supported by the physical sediment characteristics and the geochronological analysis.  The geochronological results indicate rapid deposition events in both the Greenfield Mills Pond and the Orland Dam Reservoir.  The results indicate a 96-cm layer was deposited in Greenfield Mills over a period of days.  The results also indicate a 20-25 inch thick sediment layer was resuspended and redeposited in Orland Dam over a period of days.  (Report, p. 24)

Regarding Objective 2 (i.e., whether excess sediment or the consequences of it are adversely affecting their biological or ecological health and functions relative to Reference conditions), the Report offers several conclusions that appear, at first glance, at odds with the findings of Objective 1:

1.    QHEI scores indicated good habitat quality throughout the Fawn River and reference location.  IDEM established a QHEI score of less than 51 as the threshold for poor habitat for aquatic organisms.  All Fawn River stations were above that threshold.

2.    All RBP metrics at every station scored in either an optimal or sub-optimal range, indicating good quality habitat.

3.    Overall a more diverse macroinvertebrate population was encountered downstream of Orland Dam as compared to reference condition.  In addition, the EPT Index indicated that the diverse macroinvertebrate population downstream of Orland Dam contained a high percentage of sensitive species. **As a result the excess sediments released during the May 18, 1998 event do not appear to be currently affecting the macroinvertebrate populations**

**compared to reference condition.**

4.    The mussel survey indicates that a more diverse and abundant population of mussels is present at the three study areas downstream of Orland Dam as compared to the reference site.  However, it was noted that recruitment (reproduction) is not occurring in populations identified at the reference site or the three Fawn River study areas. As a result, it is **unlikely** that the lack of recruitment is **directly related** to the presence of excess sediments within Fawn River.

5.    The results of the investigations performed to evaluate Project Objective 2 indicate a partially healthy habitat.  The outcome of the stream morphology evaluation, habitat assessment, and benthic invertebrate investigation all suggest the habitat is suitable to support a fully functioning ecosystem.  However, the results of the bivalve study and general observations during the studies indicate there are some problems (i.e., lack of recruitment of young bivalves; inability of fish community to overwinter).

Finally, with respect to Objective 3 (i.e., whether excess sediment or its consequences is adversely affecting their physical aesthetic or recreational health and values, relative to those uses and values that existed immediately prior to May 18, 1998), the Report concludes that:

Based on the physical data presented above it is apparent that excess sediment is currently present within both oxbows and Greenfield Mills Pond.  Though this excess sediment has changed the aesthetics of Greenfield Mills Pond and to a lesser extent both oxbows, these areas are still functional.  (Report at p.26)

From the court's initial  review, the Report appeared to  generally conclude that excess sediments from the May 18, 1998 were found in two oxbows of the Fawn River and the Greenfield Mills Pond but the sediment had only limited impact on the biological and aesthetic nature of those areas.[7]  Given this interpretation, the Court ordered a hearing wherein the undersigned could hear testimony from CH2M Hill as to whether the Court's interpretation of the Report was accurate.

---

[7]As was explained during the hearing, the channels of the Fawn River were not tested, specifically because of the Defendants' desire to curtail the costs of CH2M Hill's work.

Two CH2M Hill representatives, William J. Priore ("Priore") and Russell Short ("Short"), testified at the hearing.[8] Priore testified at length about the Report's findings that excess sediment was found at the river bottom and confirmed that in fact, while the objective historical data he reviewed indicated that the upper two and a half miles of river was historically a gravel bottom and the lower two and a half miles was historically a sand bottom, there was excess sediment present to a large degree in the areas of the Fawn River that were tested. (Transcript at pp. 41-43, discussing findings of grab sampling). Moreover, when asked, Priore specifically indicated that there was no question in his mind that the examined areas were affected by the events of the May 18, 1998 event so as to support continuation of the remediation plan. (Transcript at p. 67).[9]

CH2M Hill's second representative, Short, testified as to the biological and ecological health of the river. His testimony clarified for the Court that the biological/ecological effects of the May 18, 1998 release of sediments were devastating:

> Q    Are you familiar with, um, EPA's position on sediment and gravel-bottom streams?
> A    I have seen a lot of work that EPA has...discussed regarding sediment impacts to riverine systems, correct.
> Q    Really brief description of what it is.
> A    High sediment flows in riverine systems tend to follow conditions that are on the bottom and impact the habitat that is used by aquatic organisms.
> Q    So, was my description correct that when formerly clean gravel bottom becomes filled with silt and sediment that it no longer allows those areas as habitat for the

_____

[8]The resumes of these two individuals were submitted to the court prior to the hearing and no argument or objection was made asserting that the witnesses were not qualified to provide expert testimony.

[9]   Priore responded to the court's question in this way:

THE COURT:   ...Is there any question in your mind that the period -- the places that you examined and the places covered in the report are affected by sediment that came from the May 1998 event?
THE WITNESS:        No, sir...
THE WITNESS:        I believe they all come from that event.

8

macro-invertebrates?

A    It will impact the habitats, yes.

Q    Reduce its, reduce the overall habitat?

A    That's correct.

Q    Which will reduce overall population of macro-invertebrates in the stream?

A    That's correct.

Q    Which will reduce the availability for food for fish in the stream?

A    That's correct.

Q    All right. Sediment and mussels. What is, um, what, what is one of the three major impacts on mussel survivability in the stream according to the United States Fish & Wildlife Service?

A    Well, sediments can flow into the gills, and clams are filter feeders, their mussels are filter feeders, and they depend upon pulling water in for survival. If there are suspended sediments or sediments that will follow the gills, and they will not be able to survive.

Q    Right, it kills them?

A    Right.

Q    If you have a formerly clean gravel bottom stream that had a large population of mussels documented in it and you then have a stream with lots of sand and sediment in it, does it surprise you the mussels are slowly dying off in the stream?

A    I would think there would be impact to the mussel population.

Q    In fact, the mussel survey documented that the mussels are slowly being extirpated from the stream; did it not?

A    It indicated that there was very old clams there and didn't look like there was any recruitment.

Q    And a lot of dead shells on the bottom of the stream?

A    That's correct.

Q    No babies were found?

A    That's correct.

(Transcript, 79-82).

Based on the Report and now, the testimony of the CH2M Hill representatives, the Plaintiffs contend that there is more than sufficient evidence to warrant continuation to phases two and three of the Modified Order. Defendants', in turn, have objected in both their filings and during the hearing to continuing further under the Modified Order arguing that the conclusions of Phase I were insufficient to support continuation of the remediation effort. The Defendants argued, for instance, that no *objective* evidence of a "hyperflow event," i.e. that a deluge of sediment entered the Fawn

9

River from the May 18, 1998, was demonstrated in the report. (Transcript at p. 16: "Well, it is our

contention that there is no support for the fact that there was a hyperflow event."). Likewise, the

Defendants, while acknowledging CH2M Hill's findings of the existence of sediment in the Fawn

River, (see Transcript at p. 9: "Let me just say first of all, obviously you look at the bottom line

conclusion in the report, it is yes, that, that there has been some impact from excess sediment,")

argued that there was no evidence of the age or source of those sediments. Finally, the Defendants

challenged the scientific processes employed by CH2M Hill in arriving at its conclusions.

> The Modified Order, to which the Defendants stipulated,[10] clearly sets forth the following:
>
> (1) "The parties and IDNR have agreed that as to the Fawn River from the Orland IDNR dam through and including the Greenfield Mills Pond, any excess sediment that may be found which does not match historical data, evidence, and descriptions of conditions prior to May 18,1998, resulted from the May 18, 1998 events at issue in this case."
>
> (2) "[T]he parties have agreed a forensic scientific source and fate investigation of any excess sediment that may be found *is not necessary*...CH2M Hill shall prepare an assessment of current conditions of the Fawn River and Greenfield Mills pond, and of the presence of excess sediments in the Fawn River and Greenfield Mills pond, *without the need for an investigation or determination of the cause or source of excess sediments.*"

(Modified Order at p.1). Prior to agreeing to the above Order, the Defendants hindered CH2M Hill's

progress on several occasions by issuing "stop-orders" to CH2M Hill and petitioning the Court for

relief from the cost of certain testing.[11]  In addition, the Defendants filed objections to the scope of

---

[10]Present defense counsel was not retained at the time the Defendants made these stipulations.

[11]Priore testified that certain tests would have been helpful but that CH2M Hill was prohibited from performing certain tests due to objections raised by the defendants:

> Q    Neal talked with you about this question of damage to the, the, the river bed, the main river bed of the Fawn River below the Orland Dam, and this, this issue of embeddedness and consequences to the food chain, etc. In Hill's original work

CH2M Hill's work seeking to employ cost-containment measures.  (Docket #237).  In fact, the

Defendants' interference with the court expert became so disruptive that the Plaintiffs filed a motion

for injunctive relief seeking to prohibit the Defendants from interfering with CH2M Hill's work

performance.  (Docket # 229).

The parties negotiated the Modified Order in response to the above filings.  Thus, the

Defendants *agreed* to permit CH2M Hill to presume that any excess sediment that did not match pre-

event reference conditions was deposited in the Fawn River by the May 18, 1998 event (i.e.,

defendants agreed that any excess sediment was deposited by the hyperflow event occurring on May

18, 1998).  This agreement, contrary to Defendants' position at the hearing,  permitted CH2M Hill

to assume causation.

Moreover, Defendants presently challenge the procedures and methodologies employed by

CH2M Hill as unreliable.  Yet, it is because of the Defendants' insistence that CH2M Hill employed

---

|   | plan that you folks did after the Court hired you, isn't it true that in your original work plan, you proposed to do the cross-sectional studies of the mainstream channel as well? |
|---|---|
| A | That's correct. |
| Q | And what happened is that down the road, um, objections were raised about the cost of the studies you proposed; is that right? |
| A | That's correct. |
| Q | And ultimately, you, you were compelled, or the parties eventually asked you to pull out of your work plan the scientific cross-section of studies of the main streambed. |
| A | That's correct. |
| Q | So, if not for that, we wouldn't be standing here today speculating about what it would show, because it would have been done, correct? |
| A | Yes, sir. |
| Q | And it would have been in the report that, that you, some months ago, filed with Judge Lee; is that correct? |
| A | That's correct. |
| Q | And in your report that you have filed with Judge Lee, as I read it, you recommended that the Hill firm now be allowed or given the green light to go ahead and do these cross-section studies of the main streambed; is that right? |
| A | Well, I, I suppose in order to be able to answer, um, Judge Lee's questions on the Phase II, they would have to be done, because otherwise we would have no idea what the volume is.  We would have no idea what the quality habitat is, so on, so forth. |

11

the approach it did.  Indeed, the Defendants submitted affidavits (see docket #237 Exh. C) to this court  from its own expert indicating that the forensic tests CH2M Hill originally desired to perform and that was called for by the original appointment order "constitute[d] a highly forensic approach that will result in highly controversial results, rather than a diagnostic approach that would be useful for any necessary mitigation of damages."  (Verified Memorandum of Lenore Tedesco at p. 3).  In response to these concerns, CH2M Hill employed a revised plan agreed to by the parties in the Joint Stipulation for Modification of the Appointment Order and in the Joint Stipulation Approving Neutral's Phase I Scope.

Given the above, the Defendants' are hard-pressed to prevail on any of their objections to proceeding with the remaining phases of the Modified Order.  They acknowledge that the Report, on the whole, supports a finding that great amounts of sediment are present in the areas of the Fawn River that were studied and the court concludes that the record indeed supports such a conclusion. Accordingly, the Defendants' objections to proceeding to Phases II and III[12] are overruled in their entirety.

## CONCLUSION

Having concluded then, that CH2M Hill has determined that excess sediments are present to a substantial degree in the Fawn River and Greenfield Mills Pond as a result of the May 18, 1998 event the Court hereby ORDERS CH2M Hill to proceed to Phases 2 and 3 as set forth in the Modified Order, to wit:

**Phase II**

---

[12]At the hearing, the Court indicated that Phases 2 and 3 would be performed together and not as two separate phases.  This conclusion was reached, in part, because of testimony from CH2M Hill that it would be more expeditious to perform the phases together.

If CH2M Hill first determines that the Fawn River and Greenfield Mills pond are presently damaged due to the presence of excess sediment, CH2M Hill shall then proceed to determine what methods can be used to restore Fawn River and Greenfield Mills pond to their pre-May 18, 1998 conditions.

A.      Determine methods by which the excess sediment can be removed or otherwise remediated to restore the river and mill pond.

B.      Determine whether the available methods for removal or other remediation of the excess sediment would do more harm than good to the long term physical, biological, ecological or aesthetic resources.

C.      Determine what, if any, measures or procedures, other than or in addition to sediment removal should be implemented in order to accomplish restoration or encourage regeneration of the ecosystem, or minimize long term damage.

### Phase III.

Determine how restoration can happen. If CH2M Hill first determines that the benefits of either partial or complete sediment removal, partial or complete restoration, or other remediation measures outweigh deleterious impacts of such measures, then:

A.      Consult with the parties, IDNR and the Court to determine what permits would be needed, if any, beyond the District Court's inherent authority, its authority under the All Writs Act and the federal Clean Water Act.

B.      Construct plans and specifications for removal of excess sediments and restoration of the physical morphology and biological/ecological conditions of Fawn River and Greenfield Mills' Pond to their pre-May 1998 conditions and provide a cost estimate for the restoration plan.

At this stage of the litigation, it must be emphasized that the stretch of waterway involved in this case was widely perceived, prior to 1998, as one of the most unique natural waterways in the state.   Indeed, the Fawn River below Orland was once described this way:  "This stream reach of nearly 5 miles provides a float trip that rivals any other in the state for combined biological interest and feasibility."*Natural Areas in Indiana and their Preservation*, Lindsey, et al., Purdue University, (1969).  As the court indicated at the hearing, the Defendants, as guardians of the natural resources of the state of Indiana, should have an abiding interest in restoring, preserving, and protecting this

stretch of waterway for the citizens of Indiana.  This case is nearly eight years old (the event

occurred nearly a decade ago) and the Defendants have been found liable, subject to an appeal once

final judgment is entered, for damage they caused by their actions.  It is time to move forward,

without further delays from the parties, by developing a complete remedial plan and, to this end,

CH2M Hill is subject to the  following additional instructions:

(1)     CH2M Hill is hereby ORDERED to report to the Court as to the best course of remediation and at the conclusion of Phases II and III, it shall submit to the court a comprehensive remedial plan along with an estimated cost of performing the remedial plan.

(2)     CH2M Hill is further ORDERED to perform any and all scientific testing and examination it deems appropriate and necessary to develop a comprehensive remedial plan as set out in Phases II and III.

(3)     CH2M Hill is to engage in Phases II and III as soon as possible and complete these phases as expeditiously as possible.

SO ORDERED.

This 9th day of November, 2007

s/ William C. Lee
United States District Court

14